The first case is Cooper v. SEPTA. Beamer. May it please the court, good morning. My name is Tom Beamer and I represent SEPTA. I would like to reserve three minutes of my time for rebuttal. This appeal represents a single issue, whether SEPTA, an entity created by the Commonwealth of Pennsylvania, whose enabling act specifically designates SEPTA as a state agency and instrumentality, intended to be cloaked with sovereign immunity and structured to require substantial financial assistance from the Commonwealth in order to survive, is entitled to be treated as an arm of the state for purposes of the 11th Amendment. So we should ignore Judge Alito's comments that  SEPTA is an entity that counts, but the examination of federal law? That is not what we are contending, Your Honor. What we are contending is that at the time Judge Alito wrote the Bolden decision in 1991, Judge Alito did not have the guidance of three Supreme Court decisions that have substantially changed 11th Amendment jurisprudence. Those three cases are the Hess case, which was decided in 1994, three years after Bolden, the Doe case, which was decided in 1997, six years after Bolden, and finally the Federal Maritime Commission case, which was decided in 2002. And what those three cases teach is that the preeminent purpose of sovereign immunity under the 11th Amendment is not to protect the state fisc, which at the time of the Fidget decision, which Judge Alito relied on when he wrote the Bolden decision, the primary purpose was to protect the state fisc. And what FMC teaches in 2002, a decision by Justice Thomas, is that the preeminent purpose of sovereign immunity is to respect the dignity interests of the state as dual sovereigns. Nevertheless, in determining whether an agency is an instrumentality of the state, the state's concept of the role of the agency is only one of the three equal considerations we make, is it not? Your Honor, I agree it's one of three factors. However, as a result of the FMC case, and as Your Honor, Judge Fischer found in the Bowers case, when you're looking at that particular factor, the most important point is what does the state consider the agency to be itself? This is what Judge Fischer found in the Bowers case when he was dealing with the University of Iowa. And in this case, we have a specific designation by the Commonwealth of Pennsylvania, not only that SEPTA is a state agency, exercising state powers, but that SEPTA is intended to be cloaked with sovereign immunity. And here, the lower court below said that that factor weighed only slightly in favor using the three-part test. And what we have submitted, Your Honor, is that under the current jurisprudence of the Supreme Court, when you have an explicit designation by the sovereign itself, and that designation is that sovereign immunity is to attach, and that the entity is a state entity, that in that circumstance, the first prong of the test, how the entity is treated under state law, weighs heavily in favor of sovereign immunity. We're not saying that that ends the analysis, however, Your Honor. We agree that federal law, under the Doe case, is a standard that's applying for interpreting whether a particular agency is entitled to sovereign immunity. What we're saying is that the lower court's mechanical application of the Bolton decision, pre-FMC,  that we point out in the brief, at the time of the Bolton decision in 1991, SEPTA's Enabling Act did not have language explicitly designating SEPTA as intended to have sovereign immunity. Nevertheless, if we look at what SEPTA is, it's an agency which covers only five counties of the state. There are similar areas throughout the state for metropolitan areas and for transportation authorities. The amount of funding, there are various arguments one way or the other, but the direct subsidy is very close to what it was. The Board of Directors is predominantly independent. There are a number of factors that, if we look at them, are not significantly different from what the role of the agency was in Bolton, although the state has tried to change that with its denomination of SEPTA as a state agency, but if we look at the other factors involved, isn't that simply an attempt by the state to circumvent, not to circumvent, an attempt by the state to characterize an agency that, if we look at the traditional factors, is hardly different than it was when it was reviewed in Bolton? Your Honor, there are significant differences than at the time in Bolton in 1991. One of which, Your Honor, is focused on, which that is the sovereign, has made it absolutely clear. And Bolton was my first in bank as a judge on this court too, so I remember well. I know Your Honor was on the panel in Bolton. And at the time there was not a specific designation by the Commonwealth of Pennsylvania that SEPTA was entitled to sovereignty. But should that make a difference? Yes, Your Honor, it should. As a matter of fact, that is what Justice O'Connor said in the Hess case. The Hess case specifically says that the very first thing the court is supposed to do is look at whether or not the sovereign structured the entity with the expectation that immunity would adhere. And here the question, the answer to that question is crystal clear. Now let's focus on the other two factors that Bolton identified and see what has changed between 1991 and present. As Your Honor recognized, there are two other factors that are relevant. First is the state funding question. At the time, Judge Alito, now Justice Alito, decided Bolton, he did not have the guidance that's provided in the Hess case. In the Hess case, the court recognized that the test is whether the entity is legally or practically going to require the state to fund it. And Hess specifically looked at two situations that are analogous to SEPTA. Washington Area Metro Transit Authority, which was a decision by Judge Bork, in which he recognized that as a practical matter, the entity was structured from its inception to require substantial state subsidies in order to survive. In addition, they cited to the Alaska Railroad case out of the Ninth Circuit, and this was a decision after Judge Alito's decision in Bolton, the 1993 decision, in which the court specifically recognized that when you have a railroad that's essential to the economy of a region of the state, and practically the state's going to have to stand behind it, even though Alaska, like SEPTA, did not have a legal obligation to pay, like the Commonwealth and SEPTA. Was not the railroad in Alaska an actual agency of the state? It was an agency of the Department of Transportation, but SEPTA is an actual agency of the state. SEPTA is classified in its Enabling Act as an agency of the state. But at the same time, the governance of SEPTA is very different than the governance of the Alaska Railroad. Your Honor, it is different in part, but here we've got to be careful, because you have to remember that all of the entities you're dealing with are state entities. They're all creatures of the state. The state has a great deal of discretion in how it orders its own affairs. As the Supreme Court has recognized time and time again, going back to Justice Brandeis' famous quote, that the state's a laboratory of democracies. So when the state structures an entity and establishes it so that counties are going to have significant representation on the board, that can't be dispositive of whether or not the state intends that entity to be a state agency or not. States have to be given the freedom to structure entities in which case it's a special entity. But it's clear that the state of Pennsylvania intends SEPTA to be a commonwealth agency, exercising commonwealth powers entitled to sovereign immunity. And when you back up and you look at the funding... But with money coming from different sources. That's absolutely correct. Just like the University of Iowa and the Bowers decision. In that decision the University of Iowa received 21% of its funding from the state of Iowa. The University of Iowa, the state was not obligated to pay its debts. Nevertheless, this court determined in that case, after the guidance provided in FMC and Doe and Hess, that because the state intended the University of Iowa under its constitution to be a state entity, that it was entitled to be treated as an arm of the state. The same thing happened when this court decided the Benn case involving the first judicial district of Pennsylvania. There the state was not liable. The city was liable. It was funded by the city. Nevertheless, because Pennsylvania's constitution recognized that the Pennsylvania judicial system was a unitary system, and the state intended the first judicial district to be part of the state, that was dispositive to the analysis. Just going back to the Bowers case, there are significant differences between the University of Iowa and SEPTA. And I'm not going to go through them, but those differences clearly made it easier for our in-bank panel at that time to find that the University of Iowa was an arm of the state. Your Honor, there were differences, but some of the differences were in favor of SEPTA. In Bowers, 21% came from the state. Aside from the funding, and you can argue the amount of funding that SEPTA gets, your opponents say that the number's closer to one-third rather than one-half,  whereas the University of Iowa was much different than SEPTA. Your Honor, it was different, but there were two significant situations in the University of Iowa that are identical here that your Honor recognized. First, as your Honor said, most importantly, the state of Iowa considers the University of Iowa to be a part of the state. Here, the state of Pennsylvania in the Enabling Act has specifically said that. In addition, your Honor recognized in the Fitchett case, the New Jersey transit case, that the New Jersey Tort Claims Act applied to municipalities, whereas in Iowa, it did not. That's the identical situation that SEPTA faces. Doesn't Doe say that the relevant inquiry is the entity's potential legal liability? That's part of the inquiry, Your Honor. It says the relevant inquiry, and clearly under Section 1741 of Chapter 74, the Commonwealth is not liable for the legal obligations of SEPTA. There's no question, your Honor, that the Commonwealth is not ultimately liable as a legal matter, but practically. We're talking about legal matters here. You make the argument that practically they're liable. That subject has been frequently and will continue to be frequently debated as to whether or not they're practically liable. But the legal liability that has been laid out in the Enabling Statute I think is very much different, and I think it's something that post-Bolton, Doe actually weakens your argument that, as a result of Doe, that SEPTA is an arm of the state. But your Honor, Doe wasn't issued in isolation. Doe followed Hess, and in Hess, the court recognized specifically that it's the practical or legal obligation in the Hess course, the Hess court specifically signed it to transit agencies that are in SEPTA's position. I'm sorry, your Honor. But also, if you get indicators pointing in different directions, which we have here, then you come back to the two twin purposes. I agree with that, your Honor. And when the preeminent purpose as represented in FMC is to protect the dignity interests of the state, and as Hess said with Justice O'Connor, that that dignity interest, the first question the court asks is whether or not the sovereign, the Commonwealth of Pennsylvania, has structured the entity with the expectation that immunity will apply, that that's a preeminent purpose. And here, the answer to that question is crystal clear that the sovereign state of Pennsylvania intends SEPTA to have sovereign immunity, that that weighs heavily in favor of SEPTA. And it's different than... Excuse me, excuse me. Have any five minutes on, please. Your Honor, it's different than the case involving the University of Iowa, because the University of Iowa is recognized as being an agency of the state, but it did not have an explicit designation that it was intended that sovereign immunity would apply. So here, the first factor, the preeminent purpose of sovereign immunity to respect the dignity of the state in structuring and organizing its own affairs and having its agencies not hauled into court against its consent weighs heavily in favor of SEPTA. At the same time, this is not a situation where that is the only factor that weighs in favor of SEPTA. You have a situation here where the state is providing over $400 million a year in operating subsidies to SEPTA. That is a significant sum of money. At the same time, the state has a great deal of control over SEPTA. And yet it's still a separate body. Under state law, it's a separate body. Your Honor... It's designated as a separate body. It can sue and be sued. That's correct. It has a separate corporate existence, but as Justice O'Connor recognized, the crucial question are not those kinds of factors that the court looks at when it's ambiguous as to whether or not the state intended it to be a state agency entitled to sovereign immunity. The crucial question is what did the sovereign intent, going back to the admonition that Justice Brandeis had, that the states have to be free to organize their own affairs as the  The question is, as Justice Brandeis said, can the Commonwealth of Pennsylvania say the city of Philadelphia, the cradle of independence, is so much the symbol of the state that we are going to make it a state agency covered by sovereign immunity? There's no question that they could do that, Your Honor. The question then would become do the other factors weigh enough in favor of sovereign immunity to respect the sovereign's decision? If you look at the FSLA, what the Supreme Court said in that case is you have to see if there's any evidence that that's what's going on. Here, the state didn't simply cloak SEPTA with sovereign immunity and then turn its back on SEPTA. Here, the state intends to cloak SEPTA with sovereign immunity and provides $400 million a year in funding. In addition to that, it's argued that SEPTA can raise its fares and simply go out and raise the money for that, but the state prescribes the manner in which SEPTA can raise its fares. SEPTA just can't raise its fares. Its Enabling Act requires prior to raising its fares that it have public hearings in five counties, appoint a hearing examiner. There's a whole process prescribed by the state. So this isn't a situation where the state of Pennsylvania, the sovereign, simply attempted to cloak an agency with sovereign immunity and then turned its back on it. Rather, this is a situation where the state of Pennsylvania has recognized that SEPTA's exercising important powers and it says specifically in its Enabling Act that it's exercising the powers of the state and shall not be construed as a local municipality or instrumentality. If expenditures exceed the budget, is the state obligated to make up the difference? Your Honor, the state is not legally obligated to make up a difference, but as a practical matter, like in Alaska, SEPTA provides crucial services to the biggest region in the Commonwealth of Pennsylvania. SEPTA provides public transit in that region. As a practical matter, in the last three years, when SEPTA's structural operating budget deficit was insufficient to make up its funds, the state came in and bailed it out. What about the 14 years before that? But there was no structural operating budget deficit at that time. So an inefficient agency is more likely to be considered to have sovereign immunity than an efficient agency? No, Your Honor, that's not what I'm saying. Well, you're saying if the state is going to have to pay a lot of money to bail out an agency, that is a factor. Your Honor, you have to remember SEPTA, like Washington Area Metro Transit, which is a case that's cited specifically in Hess, was initially structured so that its fares would not cover its operating revenue. That's the way it was structured from the beginning. It was intended from the start that the state would have to pay significant revenue in order to subsidize SEPTA. And that's the situation that the Hess court recognized explicitly, and this court and Febreze recognized in a footnote explicitly as recently as 2006 is the kind of situation that the court should take into account when you don't have legal liability, but you have practical liability. The question the court has to ask is, given the history of SEPTA, given its important role in the state, given the fact that the sovereign has spoken and made its intent crystal clear, given the fact that the state provides $400 million a year in subsidies, given the fact that the state has substantial control over SEPTA, is this court going to recognize the intent of the sovereign of Pennsylvania, the sovereign state of Pennsylvania and afford SEPTA the immunity that the Supreme Court of Pennsylvania said it's entitled to and the legislature in 1994, three years after Bolton, said it's entitled to? Thank you. Good. We'll have you back on rebuttal, Mr. Baird. Thank you, Your Honor. Good. Mr. Lewis? Thank you, Your Honor. May it please the court, my name is Jordan Lewis. I'm with the law firm of Segal, Grill, Grouper, Duffy and Foster, and I am here to seek affirmance of Judge Golden's decision below. Your Honors, I believe there are two questions that are put before the court today. The first is whether Judge Golden applied to the correct legal test, and the second, assuming that answer is yes, whether he applied the test correctly. I believe that the answer emphatically obviously is yes to both, and I'm going to plunge right into the substance. As to the correct legal test, Judge Golden applied the three-factor test that has been part of this circuit court's jurisprudence since Urbano, Fitchick, Ben, Fevers, and Bowers. The three factors, as the court knows, is the treasury factor, the status under state law, and the autonomy. He took into account the change in facts and jurisprudence that have occurred since 1991, which is the year that the Bolton decision was made, and specifically, as it applies to the correct legal test, he applied each factor equally. Tell us why the Supreme Court jurisprudence has not changed the test in this area, or if it has changed the test, why you still meet it. I believe that it has, and this circuit has accounted for it. If you look at the evolution from Kess to Doe forward, you see that the treasury factor, to some extent, is downplayed so that each factor is to have equal weight. That takes into account the second interest that is recognized by sovereign immunity issues, that is to say, the dignity interest. By equaling the playing field and all three factors, that takes into account the evolved sovereign immunity case law since 1991. And that's exactly what Judge Golden did. Now, he also recognized, as the Supreme Court said in Hess, that if it's close, the treasury factor, the first factor, has greater weight, but you begin with the presumption that all three factors have equal weight. And I believe that that is the state of jurisprudence, both in the U.S. Supreme Court and certainly in this circuit, as seen quite evidently in the Federalist case, which was decided just two years ago. Plunging into the application of the test, the first test that he, or the first factor that he considered is the effect of the treasury. And the truth is, I think that the case law has evolved somewhat since Bolton relating to the treasury. I think that it is now clear that percentages of state contribution is less important than the actual legal liability. And I think that's made clear in Doe. And the parties here have quarreled over whether the state contributes 50 percent or 34 percent. In Bolton, I think that the state contribution was 27 percent. In the end, the key question, the key issue, as this Court recognized in February, is where the state contribution dwarfed any contribution here. It was 85 to 90 percent relating to the Camden school district. The key question is who owns this legal liability. And that's made clear in Doe, the U.S. Supreme Court, and February's here. And that is there is no doubt that SEPTA owns the legal liability here. That factor weighs heavily in favor of no sovereign immunity for SEPTA. Turning to the second factor, the status under state law. This Court has found four sub-factors that relate to the status under state law. And to some extent, there's something for everybody, at least in the context of this litigation. The first question is how SEPTA is treated under statutory law. And nothing really has changed since Bolton. Counsel is correct. There is statutory language that provides that SEPTA shall exercise the public powers of the Commonwealth. And courts have found that SEPTA state courts have found that SEPTA has sovereign immunity under state law. But there are three other factors. Two factors have not changed since Bolton. The factor of whether SEPTA can sue or be sued, that weighs in favor of no sovereign immunity. That hasn't changed since Bolton. Whether SEPTA is separately incorporated, that hasn't changed since Bolton. That weighs in favor of no sovereign immunity. And then there's the fourth factor, whether SEPTA is immune from state taxation. This is a factor that actually has changed since Bolton. In 2003, the Pennsylvania Supreme Court found that in certain circumstances, SEPTA is liable and must pay taxes under state law. Bolton did not have the benefit of that decision. So under the change in case law, That factor helps you. Yes, it does. Bolton found that this second element, the status under state law, weighed slightly in favor of sovereign immunity. Given the 2003 decision, at minimum, it's a closer call than it was in 1991. Finally, autonomy. In Bolton, this factor weighed in favor of no sovereign immunity, and nothing has changed in that regard except that SEPTA remains an agency with 15 commissioners, only five of which are appointed by Pennsylvania. The governor has no veto right. He can't set the agenda. The flex funding is subject to approval by the Delaware Valley Regional Planning Commission. There's a whole host of controls and structures that keep SEPTA separate. In fact, this case makes SEPTA distinguishable from the two transit authorities, the one in Alaska and the one in the District of Columbia that counsel refers to. Mr. Beamer talks about a practical obligation. Even though there may not be a legal obligation, he talks about a practical obligation. Do either Act 26 or Act 44 strengthen that practical obligation argument? I don't think so. And if not, why not? Well, first of all, it's important to understand what I believe the practical consideration to mean, and it's explained in Doe. In Doe, in effect, the state of California had no practical obligation to pay the hospital, had no practical obligation to pay the judgment, and yet it was still found to have sovereign immunity. And of course, Doe came after Hess, and helps articulate and explain Hess. With respect to either Act 26 or Act 44, no doubt the state of Pennsylvania contributes hundreds of millions of dollars, but this is a billion dollar, roughly, a billion dollar budget, and SEPTA is itself responsible for hundreds of millions of dollars, and can raise those funds, and does raise those funds, without state subsidy. Looking at practicality in a practical way, no governor of Pennsylvania is going to let SEPTA die for lack of funding because that would be the end of the political career for that governor and for the party associated with that governor, and isn't that one of the considerations we have to take into account when we're thinking about practicality? Well, I think your honor is raising a political consideration. I don't... Well, political considerations can be strong elements in what is practical and what is not practical. No doubt, but I believe the test focuses on the legal liability. If the state contributes funds to SEPTA, it does so on a discretionary basis. It is not obliged to do so. But as a practical matter, it is going to do so because the failure to do so will have such a drastic effect that no leader of state government is going to say, we won't do it. Isn't that what we're talking about, is a practical matter that they will pay? This is exactly, I believe, the argument that the Camden School District raised in February, and in February, where the contribution by the state of New Jersey was somewhere between 85 and 90 percent, that funding was found to favor no sovereign immunity because the state was not under any legal obligation to make that contribution. And I believe that that is the test, and that is the test in an unbroken string of Third Circuit decisions. So you're saying that a practical, as a matter of practical obligation, we don't consider that. We only consider legal obligation? No. The legal consideration is paramount. And I believe that there is some language in FEBRAs that says that practical considerations may be accounted for, but they are not as important and they certainly weren't as important in FEBRAs as the legal consideration, which here is clear and was clear in 1991 when SEPTA was found to not have sovereign immunity. Nothing has changed with respect to the practicalities and neither Act 26 nor 44 in any way bears on the practical considerations that existed in 1991 or today. The fact is it is totally discretionary by the state of Pennsylvania, political careers and considerations notwithstanding. You might respond to my good colleague that the sweet song of practicality may not sound so sweet to the legislators in Pennsylvania that are west of Pottstown. But in any event, there's always this political tussle. Well, SEPTA does go down into Delaware, but I guess we can't vote on that. Oh, that's true. But as a practical matter, the state, not always, but often bails out SEPTA. Why isn't that a serious consideration? It is a consideration. It is not as important as the legal consideration, as the legal liability, and again, this is one of the Bolton is the 800-pound gorilla in the room, and it is SEPTA's burden to show that enough has changed in the intervening 17 years to end up with a different result. Well, these considerations existed in 1991, and they were not enough for the en banc panel to find that sovereign immunity protected SEPTA, and more discreetly with respect to the treasury factor, that factor weighed in favor of no sovereign immunity because there was no legal liability. Do you agree that the Supreme Court has provided a new emphasis on state dignity, and that is in the sense that the state ought to be able to structure things the way they want, and we ought to give more deference to their own view? And if so, then how does that factor in here? The Supreme Court finds preeminent holds paramount or preeminent the dignity interest of states, and that that represents a change. I don't read the cases that way. I think that what the cases say is that there are now recognized two or twin interests, protection of the treasury and recognition of the dignity interest of the state. And I do agree that that language finds itself in post-Bolton Supreme Court cases. I do agree that this circuit has accounted for that language by leveling the playing field, no longer finding the treasury factor to be the most important factor, except in it's essentially the tiebreaker now. And Judge Golden applied faithfully that test, that third circuit test that accounts for the change in U.S. Supreme Court law. And it's not so much as a change, I think, as a minor tweak, but this circuit has accounted for it by leveling the playing fields and no longer finding the treasury factor to be the most important factor. Is there anything in Judge Golden's opinion that you would give greater emphasis to or lesser emphasis than he did? That is, obviously you want an affirmation. I'll give you five minutes, please. You want an affirmance. I do, Your Honor. I think he got it right. I think he got it right across the board. I think he applied the, when I began my comments today, I said that there are two questions. Did he apply the correct test and did he apply the test correctly? And I think it is clear that he did both. He applied the correct test that takes into account the change in the evolved jurisprudence since 1991 and he applied the test correctly. He took into account all the evidence that SEPTA raised and all the evidence that we were able to rebut and address and he went by the numbers. He applied the test correctly and, in fact, he had the benefit in the course of the briefing of the FEBRA's decision, which was a very recent expression by this circuit on how to apply the sovereign immunity test to entities like SEPTA. He specifically cited FEBRA's and did so faithfully. So I think he got it right. Anything else you want to tell us? Well, to repeat, we seek affirmance of Judge Golden's decision and we thank you. Thank you, Mr. Lewis. Mr. Beamer. Your Honor, to start where you left off, what has changed since Judge Alito, now Justice Alito, wrote the Bolton decision in 1991. First, it is absolutely clear that in FMC, the Supreme Court said the preeminent purpose of sovereign immunity under the 11th Amendment is to protect the dignity interests of the states as dual sovereigns under our Federalist system. In fact, in footnote 24, in the Bowers decision, this court uses that exact language when it cites to FMC. The preeminent purpose. When the Fitchick decision was decided, which Judge Alito relied on in Bolton, the preeminent purpose of sovereign immunity was thought to be to protect the state fist on pages 869 and 870 of Fitchick. That's what it says. So the preeminent purpose of sovereign immunity has changed as a result of Supreme Court jurisprudence between the 1990s and 2002. The preeminent purpose is to protect the intent of the sovereign. Justice O'Connor in Hess said explicitly that that test is designed to establish whether the sovereign established the agency with the intent that immunity would adhere. Here, the answer to that question is crystal clear. Yet, the District Court, Judge Golden, said that that factor weighed only slightly in favor of SEPTA. Our proposition is simple. Where the sovereign has spoken, where the sovereign has made its intent crystal clear that they have structured the agency as a state agency entitled to exercise state power, and where they have said explicitly that that entity is entitled to sovereign immunity, and the Supreme Court of Pennsylvania has said that it is, that that factor cannot possibly weigh only slightly in favor of sovereign immunity. And if you take a look at the Febreeze case, the Febreeze case is a good example of why it is the preeminent purpose. In Febreeze, you're dealing with a school district. Malhelfie, the Supreme Court case, said that school districts are considered to be local municipalities. New Jersey considered Febreeze to be a local municipality, not a state agency. How would you interpret a practical obligation to pay the financial, fiscal obligations of the agency? The same way the Supreme Court did in Hess, Your Honor, and that is when you look at an agency that was structured from the beginning by the state, like Washington Area Metro Transit, to require substantial state funding in order to survive, that's the way it was structured by the sovereign. In that situation, where you have a structural deficit, by definition, revenues are not going to be sufficient to pay the liability, so the state is going to have to stand behind it. I would define it the same way the Supreme Court did in Hess, Your Honor, and because Bolden didn't have the guidance provided by Hess as to practical obligations, that is a second major change. Thank you. Thank you very much. The case was extremely well argued by both sides. The Court would like to have a transcript made of the oral argument and asks that the parties share the cost, if you would please check with the clerk's office. When you leave, they'll tell you how to do that for us. We will take the matter under advisement. Again, we thank counsel.